[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case comes to this court as a court trial. The plaintiff's complaint indicates that it provided goods and services to the defendants for equipment to operate a shirt laundry. The claim is that as of April 18, 1992, money was due and payable including attorney's fees and finance charges. The case involves itself with a contract entered into in two parts between the parties. The first part of the contract (Exhibit A), was for the CT Page 2134 sale of a equipment by the plaintiffs hereinafter called (Yankee) and the defendant hereinafter called (Image Keepers). The agreement was that Yankee would provide and install laundry equipment to Image Keepers.
The agreement is spelled out in two parts. In Exhibit A, the contract provides for the equipment to be sold and Exhibit B provides for the installation of the equipment. In relevant parts of the contract, it is clear that Yankee agreed to install the plumbing, wiring, ducting, rigging and start-up. In addition, Yankee in Paragraph 4 of Exhibit A agreed that it was passing on to Image Keepers the manufacturer's standard warranty on parts if any. In addition, Yankee was warranting labor for new equipment and machinery for thirty days from the date of the sale. The parties have agreed that the thirty days is to be from the start-up of the equipment. The equipment was started up on November 8, 1991.
It is also clear that in Paragraph 7, of Exhibit A there is no liability on the part of Yankee for consequential damages. The contract price on Exhibit A for the equipment was for a total of $56,430.00. The contract amount in Exhibit B for installation was for $18,425.00. The defendant admits there was a contract but denies there is a balance due. The defendant by way of special defense claims payment and also has counterclaims. The first counterclaim sets forth specific items, Paragraphs 1 through 7 are items claimed to be due by Yankee to Image Keepers.
In addition, in the second counterclaim, a claim is made for a violation of the Connecticut Unfair Trade Practice Act. The plaintiff then denied the special defenses and denied the counterclaims. These issues were then tried to this court.
The court after having heard the testimony finds that the testimony of the bookkeeper and others in support of the case, have established that the items shown of Exhibit HH, attached hereto, have been proven by a fair preponderance of the evidence except as hereinafter set forth where the court has found additional credits due the defendant. Exhibit E shows that there was due, equipment totaling $48,594.60. In addition, a credit as shown on Exhibit F was given on the Hamilton gas fired water heater and no charge on the steel base. A credit in the amount of $1,690.70 was given. In addition, a control box as shown on Exhibit G was billed in the amount of $86.66. In addition, a credit on Exhibit H is shown for $38.16 on the control box and a credit on Exhibit HH for $48.50. The Hamilton gas fired hot water heater is shown on Exhibit I in CT Page 2135 the amount of $1,690.70. Exhibit J shows the Rheem NF3 Folder and the Forenta 32VB in the total amount of $6,116.20. Exhibit K is for Ted Goomey for plumbing and heating and the LM Speed Rail in the amount of $6,395.00. That was broken down as $5,525.00 for the plumbing and heating and $870.00 for the speed rail. Exhibit L is from Associated Burner Control for the restart of the boiler in sum of $212.00. Exhibit M is for Wetmore Electric, pursuant to the contract in the sum of $1,325.00. This makes a total due on equipment of $62,642.80. (All as shown on Exhibit HH.)
The plaintiff has proven the defendant has credits for payments in the sum of $50,857.50. Therefore, a balance was due as shown on Exhibit HH of $11,785.30. In addition, finance charges of 1% per month until August 1992 in the sum of $730.26 and finance charges of $3,064.10 from September 1992 to October 1994, are found to be due. Thus, the total amount due is $15,579.66. The court finds this amount to have been proven by a fair preponderance of the evidence less credits that will be assessed hereinafter for payments or for materials not delivered.
The court finds, however, that as regards Invoice No. 35771, Exhibit E, Image Keepers is due a credit of $899.90 for sales tax and a credit on that same invoice of $306.00 for late charges on the sales tax. This totals $1,205.90. That amount should be deducted leaving $14,373.76 due on equipment and finance charges.
As it relates to parts and service on Exhibit HH, Exhibit D shows the invoice for the U section in the amount of $1,603.80. Exhibit N is for labor in the amount of $115.54. Exhibit O is the invoice for a part in the sum of $3.62. Exhibit P is the invoice for a part in the sum of $4.62. The total due for parts and services on Exhibit H is $1,727.58 plus the finance charges as set forth in Exhibit HH for a total due including finance charges of $2,327.64. The court finds however, there is due a credit of $29.70 for sales tax and a credit on that invoice for late charges of $10.50. Therefore, $40.20 should be deducted leaving $2,287.44 due on parts and services and finance charges.
The total of equipment and parts and service found to be due is $16,661.20. That is due before the court issues any credits.
Further, as it relates to the defendant's claim of payment, the court finds that Exhibit 9 shows that $5,430.00 was paid in July of 1991. Exhibit 8 shows that $26,993.90 was received in October of 1991. Exhibit 7 shows that in December of 1991, CT Page 2136 $18,438.60 was received for total payments made of $50,857.50.
The court has taken into consideration in deciding that $16,661.20 is due the fact that the invoices of the plaintiff reflect credits made in the way of payments to plumbing and heating in the amount of $3,500.00, Exhibit 1. To Steven Grills in the amount of $5,600.00. Payments to LM Speed Raid for $1,425.00, Exhibit 10.
The court finds that certain credits are due the defendant. It is clear by the testimony that the Artichill portable chiller was never installed, in fact, was returned by the plaintiff to their warehouse. The cost of the item is $970.00 plus the tax of $58.20 accordingly, a credit of $1,028.20 is issued.
The court further finds that the defendant has reasonably proven that 20 feet of the White U Section extension as shown on Exhibit 52 and 53 was not installed. Only slots 1 through 960 were installed. The court issues a credit of $600.00 for $29.99 per foot, plus tax of $36.00 for a total of $636.00.
The court further finds that the contract, Exhibit B called for 100 feet of slick rail by LM Speed at approximately $15.00 per foot that 42 feet of speed rail was never installed. Therefore, the defendant is entitled a credit of $630.00 for 42 feet of speed rail together with sales tax of $37.80 for a total of $667.80.
The total additional credits awarded to the defendant are $2,332.00. The court found that based on the Exhibit HH as amended by this court, that $16,661.20 were due. With the credits of $2,332.00 deducted, the court finds that the amount due on the complaint is $14,329.20 which includes the balance due under the agreement, interest and late charges.
The agreement provides in Paragraph 3 of both Exhibits A and B that the buyer shall pay the seller all costs of collection, including but not limited to reasonable attorney's fees. The court finds that it was reasonable for the plaintiff to have brought a suit to enforce its claim. The court has examined Exhibit BB and finds that under all the circumstances, including but not limited to the length of time of the trial, the complexity of the financial issues and the defense of the claims therein, that a reasonable attorney's fee based on the sliding contingent fee scale is $2,800.00 which represents approximately 20% of the amount CT Page 2137 recovered.
The court next turns to the allegations of the defendant's case. By ruling as it has, the court has addressed the question of the complaint and the answers.
As to the first counterclaim that the court finds all of the allegations of the counterclaim being 1 through 7 have not been proven to this court's satisfaction by a fair preponderance of the evidence. The court finds as to Paragraph 1 that the telephone calls that were incurred were reasonably necessary. As to Paragraph 2, the court finds that there has been a failure to establish by a preponderance of the evidence that there was a breach of any duty and that the breach of any duty proximately caused the injuries and damages claimed by the defendant. The court finds that the equipment that was installed was properly installed and was proper equipment and that it was timely installed under all the circumstances of this case. As to Paragraph 3, the court is satisfied that the deficiencies as were brought Yankee's attention were reasonably corrected. The court is mindful of the fact that the obligation on the seller under Paragraph 4 of Exhibit A was for 30 days, thereafter it was up to the manufacturer's warranties to cover them after the equipment started up on November 8, 1991. As to Paragraph 4, the court finds that they did not fail and refuse to provide adequate training for the use of the equipment. The court finds as to Paragraph 5 that although there was a fire, it was clear from the testimony of the building official Mr. Ireland and the exhibits submitted as Exhibit JJ, that the fire was not caused by the work that was done. Mr. Ireland testified that there were plumbing and heating permits but no electrical permits. She was never shut down by any code violations. The basement is now in compliance with the code based on Exhibit JJ and the testimony of Mr. Ireland.
The court finds as to Paragraphs 5 and 6 that the plaintiff has failed to sustain her burden of proof that equipment was not installed in compliance with the state building code and building codes with the City of Norwalk. The court also finds that there has been no proof showing a deviation from the standard of care as to installation and proximate cause as to the closing of the business for gas leaks and floods. In fact, it appears that the evidence establishes that it was a problem as to gas with the city and as to the water, a defective part on the equipment and not the negligence of Yankee. The court further finds that the defendant has not established that there were faults to be cured and that CT Page 2138 there was any special loss or damage as a result of failure to cure that which did not need to be cured by Yankee.
The defendant claims in their second counterclaim, that all of the allegations of Paragraphs 1 through 7 which are the Paragraphs previously addressed, are a violation of the Connecticut Unfair Trade Practices Act. Based on the findings of the court as to those paragraphs, and their being no violation, then accordingly there is no violation of the Connecticut Unfair Trade Practices Act. The court finds that the burner and the intregal parts were approved by the insurance inspector acting as agent for the state in November of 1991. It is further clear that the plumbing and electrical work were approved by the city building inspector. It is clear that a licensed electrician did the electrical work even though he did not secure a permit. It is also clear that a licensed plumber and steam fitter took out permits for the work done. The court finds that there was no unfair trade practice established based on the evidence presented. The court finds that the mere failure to obtain the building permit does not create a violation of the Connecticut Unfair Trade Practices Act.
The court notes that although there are substantial claims made by the defendant in her counterclaims and her post trial brief dated November 9, 1994 concerning expenses incurred as it related to Paragraphs E, F, G, H, I, J, K and others, it is clear to this court that she has failed to prove responsibility or negligence, proximate cause and damages as to Yankee. This requires more than the plaintiff testifying that the proximate cause of the injuries sustained was the negligence or other deviation from the proper standards by Yankee and that proximately caused the injuries complained of. Thereafter, damages have to be proven. The court finds that the damages offered in this case were speculative as to Yankee.
Based on the court's rulings on CUTPA against the defendant and the fact that the defendant has not established that she has sustained an ascertainable loss, she is not entitled to compensatory damages, punitive damages and attorney's fees as provided for under CUTPA.
The court also finds that the overbilling on the sales tax does not rise to the level of an Unfair Trade Practice Act violation. It appears to have been a bona fide mistake made by an out-of-state company at or about the time the tax had been reduced from 8% to 6% by the Connecticut Legislature. CT Page 2139
Accordingly, judgment may enter for Yankee in the sum of $14,329.20 and against Image Keepers on all other issues, plus attorney's fees in the sum of $2,800.00.
PLAINTIFF'S EXHIBIT HH
October 25, 1994
IMAGE KEEPERS ACCOUNTS RESUME'
Account No. IMAE50 (Equipment Account: --------------------------------------
Date — — Rec'd Check No. Amount Totals Due — --- --------- ------ ------ --- 7/91 1797 $ 5,430.00 10/91 1947 26,993.90 11/91 1966 (stopped pymnt.) (amount was $18,438.60 (5.00) bank charges 12/91 1992 18,438.60 $50,857.50 ----------- Invoices --------
10/29/91 35771 48,594.60 11/5/91 36066(cr.) (1,690.70) $46,903.90
11/5/91 36054 86.66 11/6/91 36115(cr.) (38.16) 11/6/91 adjustment (48.50) -0- 11/8/91 36246 1,690.70 1,690.70 11/18/91 36624 6,116.20 6,116.20 12/31/91 38549 6,395.00 6,395.00 1/7/92 38774 212.00 212.00 1/16/92 39195 1,325.00 1,325.00 -------- 62,642.80 $11,785.30 Plus late charges at 1% per month to 8/92 --------- 730.26 Plus late charges at 1% per month 9/92 to 10/94 (26 months @ $117.85) 3,064.10 ---------- CT Page 2140
Total due on IMAE50 account $15,579.66 ----------
Account No. IMAP50 (Parts Service: ------------------------------------
10/7/91 34634 $ 1,603.80 3/13/92 41844 115.54 3/30/92 42687 3.62 4/8/92 43179 4.62 $ 1,727.58 ----------
Plus late charges at 1% per month to 8/92 150.78 Plus late charges at 1% per month 9/92 to 10/94 (26 months @ $17.28) 449.28 ---------- Total due on IMAP50 account $ 2,327.64 ---------- Grand Total Due $17,907.30 ----------